UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALPHONS D. BLADOWSKI

       Plaintiff,                    Case No. 2:09-cv-11936

v.                                 HONORABLE STEPHEN J. MURPHY, III

PRUDENTIAL INSURANCE COMPANY
OF AMERICA

       Defendant.

_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON THE ADMINISTRATIVE RECORD (docket no. 16), DENYING DEFENDANT'S MOTION TO AFFIRM THE ADMINISTRATOR'S DECISION (docket no. 18) AND REMANDING TO DEFENDANT FOR DETERMINATION

Plaintiff, Alphons Bladowski, brought this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging that Defendant, Prudential Insurance Company of America ("Prudential"), wrongfully terminated his disability benefits. The action was filed in the Circuit Court for the County of Washtenaw, Michigan on April 8, 2009 and removed to this Court on May 21, 2009. On January 25, 2010, Bladowski filed a Motion to Amend or Correct the Administrative Record, which the Court denied. Before the Court is Bladowski's Motion for Summary Judgment and Prudential's Motion to Affirm the Administrator's Decision. Bladowski asserts that Prudential's decision to terminate his benefits was "arbitrary and capricious."[1] For the

_____

[1]    In the alternative, Bladowski asserts that Prudential's termination letter was inadequate to fulfill the requirements of 29 U.S.C. § 1133(1). Bladowski alleges that Prudential did not adequately inform him of what medical evidence was required for Prudential to change its decision on appeal. The Court has already ruled that the denial letters were sufficient to comply with the procedural requirements of 29 U.S.C. § 1133 in its Order Denying Plaintiff's Motion to ReOpen And/Or Supplement the Administrative

reasons stated below, the Court finds that Prudential's decision was arbitrary and capricious, and remands the matter to Prudential for a full and fair review consistent with this opinion.

**BACKGROUND**

Bladowski was employed as a computer-assisted design ("CAD") technician at Midwestern Consulting, L.L.C. ("Midwestern"). *See* Admin. Record at 00160.[2] According to a position description produced by Midwestern, Bladowski's duties included: working closely with project managers and engineers via computer-aided design; producing isometric, base, and prospective drawings, overlays, maps and illustrations; assisting in determining time schedules for completing proposed work; overseeing drafting standards between project teams, answering drafting questions, and providing guidance on project drafting; and demonstrating an ability to learn new technology and systems quickly. *Id.* at 00152. As part of his employment, Bladowski was covered by disability insurance that Midwestern purchased through Prudential. And the benefits plan (the "Plan") is governed by ERISA.

Bladowski has a long and complicated medical history. In 1989, due to degenerative arthritis, Bladowski had a total hip replacement on his left side. *Id.* at 00354. Then, in 2001, as a result of a car accident, Bladowski began experiencing neck pain and was diagnosed with severe cervical stenosis. *Id.* at 00380. In 2002, he underwent cervical fusion surgery, which appeared to resolve his symptoms. *Id.*

In 2005, however, Bladowski began complaining of right shoulder pain. *Id.* at 00121.

Record, Docket No. 24. Thus, the Court need not rule on the issue a second time.

[2]    The Administrative Record was filed under seal (Docket No. 10).

He was treated with injections, physical therapy, and anti-inflammatory medication without relief. *Id.* X-rays showed that the AC joint was narrowed with osteolysis and that Bladowski suffered from "AC joint DJD, supraspinatus tendinosis, and biceps tendonesis versus tear." *Id.* at 00249-50. Based on these conditions, Dr. Mark Pinto restricted Bladowski from lifting, pushing, or pulling anything greater than ten pounds, and from engaging in activities which required his arms to be above chest height. *Id.*

On December 20, 2006, Bladowski underwent right shoulder surgery, including a rotator cuff repair. *Id.* at 00256. Following his surgery, Bladowski appeared to be "doing well," and Dr. Pinto recommended a regimen of physical therapy, exercising his hand, wrist and arm, icing his shoulder, and taking "non-steroidal" medications for pain. *Id.* at 00259. Dr. Pinto also cautioned Bladowski against pushing, pulling, or lifting greater than five pounds and from engaging in activities which required him to lift his arms above chest height. *Id.* In a second follow-up in March 2007, Dr. Pinto reported that Bladowski was doing "exceptionally well" and that he could do most of his daily activities "without difficulty, problems, complaints, or symptoms." *Id.* at 00262.

In September 2007, however, Bladowski began experiencing mild pain in his shoulder. *Id.* at 00263. On October 2, 2007, Dr. Pinto reported that "when [Bladowski] does significant drafting and he does this all day, he will have pain at the end of the day rated at approximately a 6/10." *Id.* at 00264. Dr. Pinto further asserted that the pain increased over the course of the day and that Bladowski described it as "mild to moderate." *Id.* at 00264. Although Bladowski reported to Dr. Pinto in November 2007 that he had experienced "slight improvement", Bladowski underwent arthroscopic rotator cuff re-repair on December 28, 2007. *Id.* at 00266, 00272.

At that point Bladowski stopped working and subsequently applied for short-term disability ("STD") benefits through the Plan. *Id.* at 00184. The Plan offered STD benefits for a period of up to 90 days and long-term disability ("LTD") benefits after an elimination period of 90 days. *Id.* at 00023. Bladowski was approved for STD benefits, effective January 26, 2008. *Id.* at 00149-50.

Initially, Bladowski seemed to recover well from his surgery and did not experience any numbness or tingling. *Id.* at 00277. On January 14, 2008, however, Bladowski reported that he was experiencing "numbness and tingling in both his upper extremities." *Id.* at 00279. Three days later, on January 17, 2008, Bladowski went to the emergency room for complaints of neck pain and tingling arms. *Id.* at 00280. During his visit, Bladowski reported that he had been using Vicodin, Skelaxin, and Voltaren without any apparent relief of the symptoms.[3] *Id.* Dr. Susan Sullivan obtained and reviewed an MRI taken the previous day which showed "cervical spondylosis and postoperative changes, with associated foraminal narrowing at multiple levels, but without severe stenosis of the cervical spinal canal." *Id.* at 00280, 00282. She treated Bladowski with morphine and Benadryl, and discharged him with instructions to use a soft collar as able, continue to support his right upper arm, and take Percocet, a narcotic drug, for pain relief, along with a muscle relaxant. *Id.* at 00280. Dr. Sullivan further advised Bladowski to follow-up through the Spine Clinic at the University of Michigan. *Id.*

Bladowski was evaluated on January 23, 2008 by Dr. Lynda Yang from the University of Michigan Department of Neurosurgery. *Id.* 00276, 00373. Dr. Yang found that

---

[3]         Vicoden is a narcotic drug used for pain relief; Skelaxin is a muscle relaxer; and Volteran is a non-steroidal anti-inflammatory drug.

Bladowski's shoulder was doing well following his surgery, but that he was experiencing neck pain radiating down both arms. *Id.* After reviewing an MRI scan, Dr. Yang determined that Bladowski did not demonstrate any neurological compromise, and she informed him that the risks of having another surgery outweighed any possible benefits. *Id.* Dr. Yang asserted that his symptoms were likely due to musculoskeletal difficulties. *Id.*

On February 21, 2008, Dr. Pinto reported that Bladowski, while still experiencing some pain in his neck, had made "big improvements" and that both his neck and shoulder were "feeling much better." *Id.* at 00296. Despite these improvements, Dr. Pinto determined that Bladowski was "disabled and unemployable" because he was unable to keep his shoulder in a flexed position, and he advised that Bladowski would remain out of work for six weeks, at which point he would be re-evaluated. *Id.* at 00296-97. Dr. Pinto stated, however, that Bladowski's impairments were temporary and likely to improve with time and medical intervention.

Pursuant to the Plan, Bladowski's STD benefits were scheduled to end on March 28, 2009. *Id.* at 00094. On March 17, 2008, Bladowski was informed that based on the medical information in his claim file, he had been approved to receive LTD benefits from March 27, 2008 through April 3, 2008. *Id.* at 00153.

On April 3, 2008, Dr. Pinto reported that Bladowski continued to have "fluctuating symptoms" which appeared to be related to his neck, and that he was also experiencing shoulder pain and weakness. *Id.* at 00328. Further, he advised that Bladowski was still subject to the same restrictions and limitations that had previously been imposed. *Id.* Although he again stated that the impairments were temporary, Dr. Pinto indicated that

Bladowski would remain "totally disabled" until May 15, 2008. *Id*. Prudential subsequently extended Bladowski's LTD benefits through that date. *Id*. at 00097.

On April 7, 2008, Dr. Rodney Dewyer, at the University of Michigan Pain Clinic, reported that Bladowski's neck was causing him "a great deal of pain" and that the pain was "not quite controlled" despite the fact that Bladowski had been taking Vicodin. *Id*. at 00374. Bladowski told Dr. Dewyer that although Percocet tended to more effectively reduce his pain, he was nervous about his ability to function at work while on Percocet. *Id*. Further, Bladowski informed Dr. Dewyer that he was starting to seriously consider the possibility of medical disability. *Id*. Dr. Dewyer prescribed Percocet for Bladowski, though his report at the time does not indicate whether the prescription would affect Bladowski's ability to work. *Id*. Dr. Dewyer's only comment on Bladowski's work status was that he was out of work for one more month per orders from Dr. Pinto. *Id*.

On May 5, 2008, Dr. Pinto reported that Bladowski had been "discharged from physical therapy," but that he still continued to experience numbness and tingling. *Id*. at 00339. Dr. Pinto also reported that Bladowski "states he has regained much of his motion and strength, but still continues to have. . .[symptoms] related to numbness and tingling." *Id*. Dr. Pankaj Guglani from the University of Michigan Pain Center subsequently evaluated Bladowski and indicated that he was experiencing continuous pain, rating on average from a six to an eight out of ten, and that the only "relieving factor" was medication. *Id*. at 00380. Dr. Guglani made no changes to Bladowski's pain medications, but he scheduled a series of "medical branch block" injections in Bladowski's neck to treat his

symptoms.  *Id.* at 00383.[4]

Bladowski continued to receive treatment throughout July and August of 2008.  On July 17, 2008, Prudential extended Bladowski's LTD benefits through either July 31, 2008 or through the completion of his last nerve block injection.  *Id.* at 00107.  Subsequently, on August 14, 2008, Prudential contacted Bladowski for an update on his condition.  Bladowski indicated that his right shoulder was completely incapacitated and that he had no use of his right arm.  *Id.* at 00136.  Bladowski explained that he was continuing to receive injections, and that his last injection was scheduled for August 21, 2008.  *Id.*  At that time, Prudential informed him that it would extend his LTD benefits through August 31, 2008 but that no further benefits would be recommended until additional medical records were received.  *Id.*

On August 21, 2008, Dr. Pinto indicated that Bladowski reported he was "doing well" and was not experiencing many problems with his shoulder.  *Id.* at 00353.  Dr. Pinto further indicated that Bladowski had just completed a series of injections on his neck.  *Id.*  At that point, Dr. Pinto recommended that Bladowski should "increase activities as tolerated."  *Id.*

On September 16, 2008, Bladowski was informed that he no longer met the requirements for additional LTD benefits and that his benefits were terminated effective September 1, 2008.  *Id.* at 00183.  Under the Plan, Prudential had discretion in making benefits determinations. The Plan provided that:

_____

[4]    On May 29, 2008, Bladowski went to the emergency room with a fractured hand, which he had injured by bumping it against a door.  *Id.* at 00342.  Notes from the emergency room indicate that Bladowski was continuing to use his "usual" medications, Vicodin and Percocet for the pain.  *Id.*  Dr. Pinto found on June 9, 2008 that Bladowski had full range of motion in his fingers and that there was no significant swelling.  *Id.* at 00345.

> The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious.

*Id.* at 00016.

Prudential's termination letter explained that Bladowski no longer met the requirements for "disability" under the Plan, which provided that a claimant was disabled when he or she was unable to perform the material and substantial duties of his or her regular job, was under the regular care of a doctor, and had a 20% or more loss in monthly earnings due to sickness or injury. *Id.* at 00183. Prudential explained that "material and substantial duties" means duties that "are normally required for the performance of your regular occupation" and "[duties] which cannot be reasonably omitted or modified." *Id.* at 00184. Prudential asserted that based on a review of Bladowski's medical records, Bladowski had failed to show that he was unable to perform the duties of a CAD engineer. *Id.* Prudential further asserted that a CAD engineer's job is largely sedentary and would only occasionally require Bladowski to lift, carry, push, or pull objects weighing over five pounds. *Id.* Prudential argued that although Dr. Pinto's restriction on lifting overhead seemed appropriate, "based on [Bladowski's] fairly good strength [as] documented in [his] physical examinations, it appears that [he] would have the ability to lift, carry, push, and pull up to 10 pounds." *Id.* at 00185.

Bladowski advised Prudential that he was appealing the decision on October 24, 2008. *Id.* at 00188. In the letter, Bladowski indicated that he was scheduled for hip

surgery,[5] *id.*, and on January 2, 2009, Prudential received medical records of Bladowski's hip surgery. *Id.* at 00114.

As part of its second review of Bladowski's claim, Prudential sent his file for an external file review by Dr. Kelly Agnew, an orthopedic surgeon. Prudential instructed Dr. Agnew to comment on the nature of Bladowski's impairment, if any, after September 1, 2008, the day Bladowski's benefits were terminated. *Id.* After a review of the file, Dr. Agnew summarized Bladowski's medical history and records, including records after September 1, 2008.[6] *Id.* at 00209-10. Dr. Agnew indicated that on September 24, 2008, Bladowski reported a 30 to 40 percent reduction in left-sided neck pain, but that right-sided numbness and tingling were noted. *Id.* at 00211. Bladowski was subsequently diagnosed with carpal tunnel syndrome. *Id.* Dr. Agnew also noted that on October 8, 2008, records

_____

[5]     On October 15, 2008, Dr. Pinto reported that Dr. Dewyer had recommended Bladowski receive a consultation regarding increased pain and discomfort in his left hip. Dr. Pinto reported that Bladowski had done well following hip replacement surgery in 1989 until approximately one year prior when he began limping and experiencing difficulty walking, which required him to begin using a cane. Admin. Record at 00354.

[6]     Dr. Agnew's report indicates that the following files were reviewed: Dr. Pinto's office notes from 19 different dates ranging from May 2006 through December 2008; Dr. Yang's office notes from January 23, 2008 and May 8, 2008; Dr. Dewyer's office notes from four dates ranging from April 2008 through November 2008; Dr. Guglani's office notes from three dates ranging from May 2008 through October 2008; Office notes from Doctors Carpenter and Lama ranging from October 2008 through November 2008; Emergency Room records from January 17, 2008 and May 29, 2008; Operative reports from December 20 and 28, 2007; Procedure reports from May 16, 2008, July 28, 2008, and August 21, 2008; A discharge summary from November 28, 2008; An MRI of Bladowski's cervical spine from January 16, 2008; X-rays of his right hand; X-rays of his hip and pelvis from October and November 2008; Physical therapy records from 2008; An Attending Physician Statement from February 25, 2008; Employment status updates; Attorney correspondence from October 24, 2008; Three sets of laboratory studies taken from April through November 2008; An EKG from November 2008; and Prudential internal SOAP notes from 2008 and 2009.

indicated that Bladowski was unable to return to work due to "diffuse pain and inability to perform more than two to three hours of computer work at any given time." *Id.*

Based on this documentation, Dr. Agnew found that Bladowski had functional impairments, from September 1, 2008 forward, related to a combination of conditions. *Id* at 00212. Dr. Agnew asserted that based on these functional limitations, Bladowski was restricted from lifting and carrying more than 20 pounds occasionally, and that frequently he could carry 10 pounds below the level of his chest. *Id.* at 00213. Dr. Agnew further indicated that Bladowski should not engage in repetitive extension, flexion, or rotation of his cervical region. *Id.* Dr. Agnew also stated that Bladowski was not subject to any specific limitations with regards to sitting, walking, standing or driving, and that barring any complications, Bladowski would be able to "resume these activities without any restrictions" within three months of his hip surgery. *Id.*

Further, Dr. Agnew found that Bladowski's medications, which included multiple narcotics, could create some cognitive defects and were not recommended for long-term use. *Id.* Therefore, Dr. Agnew asserted that Bladowski should abate the use of narcotics within three months of his hip surgery and return to "non-addictive pain medications." *Id.* Dr. Agnew admitted, however, that "it is difficult to tell from the medical records alone exactly what Bladowski's 'self-reported chronic pain' might be," but that "there are multiple and significant diagnoses that could cause these complaints. *Id.* at 00214. Thus, Dr. Agnew indicated that permanent limitations and restrictions were recommended. *Id.*

Finally, Dr. Agnew asserted that based on this analysis, "[F]rom an orthopedic perspective, [Bladowski] would be able to function in the light duty range on a permanent basis. It is not expected that any of his issues will resolve. He will be permanently

restricted for his lifetime." *Id.* at 00214.

On March 16, 2009, in response to additional questions from Prudential, Dr. Agnew clarified that all medical conditions, including Bladowski's hip surgery were taken into account in the initial evaluation. *Id.* at 00220. Dr. Agnew also clarified that from September 1, 2008 "up until approximately the end of January 2009, [Bladowski] would have been able to function in a sedentary duty capacity, taking into account the hip." *Id.* at 00221. Confusingly, however, Dr. Agnew asserted that following his hip surgery in November 2008, Bladowski would have been "totally impaired" for three months of post-operative recovery. *Id.* Based on this analysis, Dr. Agnew stated that Bladowski could function in a full-time sedentary capacity as of September 1, 2008, and that following three months of recovery from his hip surgery, he would be able to move into the light work range. *Id.*

On March 31, 2009, Prudential informed Bladowski that his appeal had been denied. Prudential explained that after a review of his medical records, it concluded that "the restrictions in effect September 1, 2008 would not have precluded" him from "performing the material and substantial duties of his occupation." *Id.* at 00233. Thus, Prudential affirmed its decision to terminate Bladowski's benefits.

## STANDARD OF REVIEW

In an ERISA benefits action, a district court reviews the denial of benefits "based solely on the administrative record." *Wilkins v. Baptist Healthcare Sys. Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). When, as in this case, the plan affords the administrator discretionary authority over benefits determinations, the court reviews the denial of benefits under the "arbitrary and capricious" standard. *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009) (citing *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005)). The

Sixth Circuit has explained that arbitrary and capricious review:

> is the least demanding form of judicial review of administrative action. When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.

*Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000) (internal citations and quotations omitted).

Under this standard, "[t]he plan administrator's decision should be upheld if it is 'the result of a deliberate, principled reasoning process' and 'is supported by substantial evidence.'" *Delisle v. Sun Life Assur. Co.*, 558 F.3d 440, 444 (6th Cir. 2009) (quoting *Glenn v. Metlife*, 461 F.3d 660, 665 (6th Cir. 2006)). The Court considers "several factors in reviewing a plan administrator's decision," including the "quality and quantity of medical evidence and opinions." *Delisle*, 558 F.3d at 444. Further, a court must consider a plan administrator's decision to review a file rather than to conduct a physical examination. *Calvert v. Firestar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). The Court, however, is not obligated to accord any special deference to the opinions of the claimant's treating physician. *Bishop v. Metropolitan Life Ins. Co.*, 70 Fed. Appx. 305, 311 (6th Cir. 2003) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003)).

Bladowski asserts that the Court should apply a heightened standard of review because Prudential was both the plan administrator and the benefits provider. While the Court agrees that Prudential's role as both the administrator and benefits provider creates a potential conflict of interest, Bladowski's assertion is an incorrect statement of the law. A conflict of interest does not alter the standard of review. Rather, a court may consider

a conflict of interest as a factor in determining whether the administrator's decision was arbitrary and capricious. *Peruzzi v. Suma Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998).

**ANALYSIS**

Bladowski argues that Prudential's decision was arbitrary and capricious because 1) it failed to consider the effect of his medications on his job performance; 2) Prudential had a conflict of interest because it was both the plan administrator and the benefits provider; 3) it conducted only a file review, which was incomplete for failure to consider Bladowski's physician's assessments, his pain levels, or his specific job requirements; and 4) Prudential failed to consider his hip surgery when making its determination.

1. Medications

Bladowski asserts that Prudential and Dr. Agnew failed to consider the affect that his pain medications would have on his job performance. In support of his position, Bladowski relies on *Smith v. Continental Cas. Co.*, 450 F.3d 253, 265 (6th Cir. 2006). In *Smith*, the Sixth Circuit did find that the plan administrator's decision was arbitrary and capricious because it failed to consider the affects of the claimant's medications on her job performance. The present case, however, is distinguishable from *Smith*.

In *Smith*, after the claimant received a final denial letter, she contacted the administrator and asked that they consider the effects of her medication. *Id.* at 264. Further, the claimant's physician sent a letter stating that "in my medical opinion, it would be very difficult to function under the influence of [Smith's] medications." *Id.* This letter was never reviewed by the physician performing the file review because the administrator did not forward this letter to the physician. *Id.*

In Bladowski's case, however, aside from Dr. Dewyer's assertion that Bladowski had

to limit taking his pain medication if he wanted to do "anything at all such as drive," no doctor has ever stated that Bladowski would be unable to work as a result of his medications, despite the fact that Bladowski expressed concern over the use of narcotics multiple times. Further, Bladowski's medical records do not demonstrate that he has any cognitive defects as a result of his medications. Rather, the files indicate that Bladowski was "alert and oriented," and had "good insight and judgment." Admin. Record 412. Thus, the Court finds that Prudential's failure to consider the effect of Bladowski's medications on his job performance does not render its decision arbitrary and capricious.[7]

2. Conflict of Interest

The Court must also consider whether Prudential's potential conflict of interest was a factor in its decision. The Sixth Circuit has held that "mere allegations of the existence of a structural conflict of interest are not enough; there must be some evidence that the alleged conflict of interest affected the plan administrator's decision to deny benefits." *Cochran v. Trans-General Life Ins. Co.*, 12 Fed. Appx. 277, 281 (6th Cir. 2001). In this case, neither Bladowski, nor the administrative record, demonstrate any evidence that Prudential's conflict of interest affected its decision to deny benefits. Therefore, the Court cannot conclude that Prudential was acting in a self-interested manner in this case. *Id*; *See Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998) ("Because our review of

---

[7]     The Court notes that Dr. Agnew's recommendation that Bladowski abate the use of narcotics within three months of his hip surgery appears to demonstrate that Dr. Agnew failed to recognize Bladowski's long-term use of narcotics. This failure, however, does not change the Court's analysis because it does not alter the fact that none of Bladowski's physicians ever opined that his medications made him unable to work, or the fact that Bladowski was never described by any physician as having any cognitive deficits.

the record reveals no significant evidence that SummaCare based its determination on the costs associated with Mrs. Peruzzi's treatment. . .we cannot conclude that SummaCare was motivated by self-interest in this instance.").

3. <u>File Review</u>

Bladowski also asserts that the Court should give less deference to Prudential's decision to terminate benefits because it chose to conduct only a file review, despite the fact that the Plan allowed Prudential to conduct a physical examination.

First, the Court notes that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert v. Firestar Fin. Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). The decision to conduct only a file review is, however, a factor in the Court's determination. *Smith v. Continental Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006). The Sixth Circuit has held that "the failure to conduct a physical examination – especially where the right to do so is specifically reserved in the plan – may in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert*, 409 F.3d at 295, 296-97 (the file review was inadequate because the reviewer failed to review claimant's entire file, did not mention the Social Security Administration's determination that claimant was disabled, and made adverse credibility determinations); *See also Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008) (the file review was inadequate because it did not mention or attempt to explain why its determination was contrary to a determination by the Social Security Administration, the reviewer made credibility determinations based solely on the file review, and the determination was contrary to objective medical evidence); *Kalish v. Liberty Mutual/Liberty Life Assur. Co. Of Boston*, 419 F.3d 501, 509 (6th Cir. 2005) (the file review was

inadequate because it contained a six-page summary of claimant's medical records, but only one page of analysis, which contained "little more than. . .conclusory assertions that the records did not document a need for restrictions that would "necessarily preclude the employee from performing the duties of the job as described.").

Because the Plan provides Prudential with the right to conduct a physical examination, the Court considers the decision to conduct only a file review as a factor in its analysis. At the outset, the Court notes that Dr. Agnew appeared to conduct a review of substantially all of Bladowski's medical records, did not make any credibility determinations, and, because Bladowski has not applied for Social Security Benefits, Dr. Agnew's decision was not contrary to any previous decisions by the Social Security Administration. Further, insofar as Bladowski claims that Prudential and Dr. Agnew ignored his physicians's assessments that he suffered from multiple disabilities, the Court disagrees. Prudential and Dr. Agnew summarized Bladowski's medical records, and Dr. Agnew agreed that Bladowski had "impairment from multiple conditions." Admin. Record. at 00212.

Nonetheless, there are several perplexing omissions in both Dr. Agnew's and Prudential's assessments. First, both Prudential and Dr. Agnew fail to address determinations by Bladowski's treating physicians that he was unable to work. Prudential asserts that "not one of [Bladowski's] doctors said that [he] could not perform the physical tasks of a CAD operator" as of September 1, 2008. *See* Def. Motion to Affirm Administrator's Decision (docket no. 18 at 20). Bladowski's records demonstrate, however, that his physicians did opine that he was unable to work during that period. On September 3, 2008, Dr. Dewyer stated "Certainly at this point, [Bladowski] would not be

able to work." Admin. Record 00407. Further, Dr. Agnew's summary of Bladowski's medical file states that "records dated [October 8, 2008] noted. . .the claimant's inability to return to work due to diffuse pain and inability to perform more than two to three hours of computer work at any given time." *Id.* at 00211.[8] Neither Dr. Agnew nor Prudential provide any explanation for why they reached the contrary conclusion that Bladowski would be able to "function in a light duty range on a permanent basis." Admin. Record 00214.

While a plan administrator is not required to "accord special deference to the opinions of the treating physicians", it also cannot "arbitrarily repudiate or refuse to consider the opinions of the treating physician." *Glenn*, 461 F.3d at 671. As Bladowski asserts, an administrator cannot simply "cherry-pick" the evidence from the record that is favorable to a decision to terminate benefits and arbitrarily disregard unfavorable evidence. *Elliott*, 473 F.3d at 620 ("Generally speaking, a plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternate conclusion."); *Compare Curry v. Eaton Corp.*, Nos. 08-5973, 08-6369, 2010 U.S. App. LEXIS 19706, *23 (6th Cir. September 20, 2010) (administrator's letter explained that it reached a contrary conclusion from claimant's physicians because "although [claimant's] physicians have opined that she is unable to work, they do not provide any objective clinical medical evidence to support these opinions [and] each medical reviewer. . .concluded that the objective information did not support a finding that [claimant] was unable to perform any occupation."). Therefore,

---

[8]    The record Dr. Agnew referred to is a report from Dr. Guglani which states that Bladowski "continues to experience aching pain in his whole neck and shoulder pain, sometimes radiating down either arm. . .His inability to work from diffuse pain complaints continues or stating that he is unable to perform more than 2 to 3 hours of computer work at any given time, before he is exhausted and not able to perform any further work." Admin. Record 00420.

the Court considers Prudential's failure to provide any explanation for why it reached a conclusion that Bladowski could work as one factor tending to show that Prudential's decision was arbitrary and capricious.

Bladowski also asserts that Prudential looked only at his orthopedic restrictions, and failed to address evidence that he could not work because he had inadequate control over his pain. The Court agrees that the lack of analysis of Bladowski's pain favors a finding that Prudential's decision was arbitrary and capricious. Despite Dr. Agnew noting that records from October 8, 2008 indicated that Bladowski could not work due to diffuse pain, neither Prudential nor Dr. Agnew discuss this statement. Nor do they address Dr. Dewyer's statement that Bladowski had "borderline" control over his neck pain, or Dr. Guglani's report that Bladowski told him that he could only work for three hours in his home office before running out of pain tolerance. Admin. Record 00407. In fact, Dr. Agnew's report asserted only that "it is difficult to tell from the medical records alone exactly what one's 'self-reported chronic pain' might be. . .[but] there are multiple and significant diagnosis" which would be expected to cause "some level of complaint." *Id.* 00214. In light of the fact that Dr. Agnew was unable to adequately evaluate Bladowski's pain, Prudential's decision to terminate his benefits without any reasoned explanation for its determination that Bladowski could work despite his reported pain favors a decision by the Court that Prudential's determination was arbitrary and capricious.

Finally, Bladowski asserts that Dr. Agnew's and Prudential's orthopedic assessment did not take into consideration the material and substantial duties of his job, but rather focused on how much weight-bearing the job required and whether it required reaching above his shoulders. Prudential asserts that its determination is supported by evidence

that Bladowski could work on a computer for up to three hours a day.

Pursuant to the Plan, a claimant is disabled when he or she is unable to perform the material and substantial duties of his or her regular job. When a disability determination is made in a case involving an "own occupation" policy, the Sixth Circuit has confirmed the importance of a specific occupational inquiry. *Elliott*, 473 F. 3d at 621 (administrator's decision was arbitrary in part because, while claimant's job was largely sedentary, it involved numerous job responsibilities, which administrator failed to specifically evaluate). Although Bladowski's position may be mostly sedentary, neither Dr. Agnew nor Prudential evaluated whether Bladowski could perform the essential duties of his job, including drafting detailed construction drawings. Rather, Dr. Agnew simply lists a series of limitations and restrictions, regarding lifting, pushing, pulling, and fine motor hand activities[9], and asserts that based on these limitations, Bladowski can perform full-time sedentary work. Neither Prudential nor Dr. Agnew provide any reasoned explanation for why they believe Bladowski could perform tasks such as drafting detailed drawings in spite of the multiple impairments from which they admit Bladowski suffers.

Along with Prudential's failure to address assessments of his ability to work and his pain levels, its failure to specifically evaluate Bladowski's essential job duties, favors a finding that Prudential's decision was arbitrary and capricious.

4. Hip Surgery

Bladowkski also asserts that Prudential's decision was arbitrary and capricious

---

[9]     Dr. Agnew's assertion that Bladowski would not have any limitations with regards to fine motor hand activity does not discuss the fact that he had been diagnosed with carpal tunnel syndrome.

because it ignored that he had hip surgery in November 2008. Bladowski asserts that it is undisputed that he was totally disabled following the surgery, and that Prudential's failure to consider this renders the decision arbitrary and capricious. Prudential argues that no doctor ever asserted that Bladowski was totally disabled following his hip surgery.

If Prudential failed to consider Bladowski's hip surgery, that omission would be critical. "[T]he failure to consider evidence that is offered after an initial denial of benefits renders a final denial of benefits arbitrary and capricious." *Glenn*, 461 F.3d at 672 (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712-14 (6th Cir. 2000)). The Court finds, however, that Prudential did not fail to consider Bladowski's hip surgery. In fact, after receiving Dr. Agnew's first report, Prudential specifically asked Dr. Agnew to "Please clarify, effective September 1, 2008, what were the restrictions and limitations as a result of all the medical conditions noted on file review [including Bladowski's hip surgery in November 2008]?". Admin. Record 00218. In response, Dr. Agnew stated "From [September 1, 2008] up until approximately the end of January 2009, the claimant would have been able to function in a sedentary duty capacity, taking into account the hip." *Id.* at 00221.

What is concerning to the Court, however, are the contradictory statements in Dr. Agnew's own assessment. Despite stating that Bladowski could function in a sedentary duty capacity, Dr. Agnew then stated "Also, of note, as the claimant did undergo hip revision in November 2008, he would have required a period of 3 months for postoperative recovery, where he would have been totally impaired." *Id.* Further, Dr. Agnew stated that "no specific limitations of walking, sitting, standing, or driving were recommended, as soon as recovery from the left hip revision did occur," which indicates that there were restrictions on these activities during the recovery period following Bladowski's hip surgery. *Id.*

The Court does not find that medical evidence conclusively shows that Bladowski was impaired following hip surgery. Dr. Greg Carpenter reported that Bladowski was "doing exceptionally well. . .he is ambulating with a cane." *Id.* at 00371. Dr. Carpenter also noted that Bladowski had pain-free range of motion in his left hip, and that he did not require any additional pain medication. *Id.* The Court finds, however, that Dr. Agnew's contradictory statements and confusing analysis of Bladowski's hip surgery, combined with Prudential's failure to consider Bladowski's doctor's opinions, his pain levels, and his specific job functions, demonstrates that Prudential's decision lacked deliberate reasoning and was arbitrary and capricious.

   5. <u>Appropriate Remedy</u>

In cases where a court is unable to uphold the decision of the plan administrator, the court may either award benefits or remand to the plan administrator for a full and fair review. *Elliott*, 473 F.3d at 621. "Where the problem is with the integrity of the plan's decision-making process rather than with the plan's substantive decision itself, the appropriate remedy . . . is remand to the plan administrator." *Spectrum Health Inc. v. Good Samaritan Emplrs. Assoc.*, 2008 U.S. Dist. LEXIS 100698, *20 (W.D. Mich. Dec 11, 2008) (citing *Elliott*, 473 F.3d at 622). The Court is not convinced, by the administrative record, that Bladowski was entitled to benefits. Rather, the Court concludes only that Prudential failed to engage in a deliberate and principled reasoning process. Therefore, the Court believes that a remand to Prudential for a full and fair inquiry is the proper remedy here. This remedy will allow for a proper determination of whether Bladowski was entitled to disability benefits.

**ORDER**

**WHEREFORE** it is ordered that Bladowski's Motion for Summary Judgment on the Administrative Record (docket no. 16) and Prudential's Motion to Affirm the Administrator's Decision (docket no. 18) are both **DENIED.**

**IT IS FURTHER ORDERED** that the case is remanded to Prudential for a full and fair determination consistent with this order**.**

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: November 10, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 10, 2010, by electronic and/or ordinary mail.

Alissa Greer
Case Manager